**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Seaboard Surety Company, a New York )     No. CV-06-0134-PHX-SMM
corporation,                        )
                                    )     **ORDER**
         Plaintiff,                 )
                                    )
vs.                                 )
                                    )
Grupo México, S.A. de C.V., a Mexican )
corporation; and DOES I-CI,         )
                                    )
         Defendants.                )
_____ )

Currently before the Court is Defendant's Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 95, Def.'s Mot. to Dismiss) and Plaintiff Seaboard Surety Company's ("Seaboard") Cross Motion for Summary Judgment.[1] Defendant Grupo México S.A. de C.V. ("Grupo México") alleges that this Court lacks subject matter jurisdiction because Plaintiff's claims are not ripe. Having considered the arguments, the Court issues the following order.

**BACKGROUND**

**A. Factual History**

In 1959 and 1960 ASARCO L.L.C. ("ASARCO") entered into two (2) mining leases and twenty-one (21) business leases for mining activities on the San Xavier and Tohono

---

[1] The Court finds that oral arguments are not necessary to aid the Court in the disposition of these motions.

O'odham Indian Reservations in Arizona.  (Doc 1; Doc 53.)  In October 1993, ASARCO entered into a General Agreement of Indemnity ("1993 GAI") with Seaboard as the surety and ASARCO as the principle.  (Doc. 1.)  The 1993 GAI includes a "Collateral Provision" stating that Seaboard may establish a reserve fund to cover "any contingent claim or claims, loss, costs, attorney's fees and/or other expenses in connection with any such Bond" and ASARCO will pay to Seaboard "funds in the amount equal to the reserve" as collateral. (Doc. 1, Ex. A.)

On January 16, 2001, the Bureau of Land Management ("BLM") and the United States Department of Interior, Bureau of Indian Affairs ("BIA") sent a letter to ASARCO ordering the cessation of mining and stripping operations within the San Xavier Reservation and gave ASARCO thirty (30) days from receipt of the notice to acquire "a revised business lease bond of $7 million, and revised mining lease bonds of $3.5 million and $760,000 respectively," in order to continue mining operations on the Indian leases.  (Doc 1, Ex. B; Doc 53, Ex. A.)

On February 15, 2001, Kevin McCaffrey, in-house counsel for ASARCO in New York, sent a memorandum to Daniel Tellechea Salido of Grupo México stating:

> It is standard practice in the insurance industry for a surety to require a parent guaranty for bonds that the surety issues.  If Asarco's financials were stronger it may have been able to negotiate a bond without a guaranty, but it is unlikely.
>
> In this circumstance, the St. Paul Surety Company has issued a number of other bonds on the assumption that a guarantee [sic] would be forthcoming. St. Paul is unwilling to issue any new bonds without a guaranty of all previously issued bonds.  Currently, St. Paul is the only surety willing to issue Asarco bonds, with or without a guaranty.

(Doc. 87, Ex. 10.)  On the same day, Hector Garcia de Quevedo, Managing Director of Grupo México, and Sergio M. Firrer, Grupo México's General Counsel and Attorney-in-fact, signed as "Corporate Indemnitor" a four-page, seventeen-section 2001 GAI ("2001 GAI") provided by Seaboard.  (Doc. 87, Ex. 9.)  After signing, Grupo México sent the 2001 GAI to ASARCO's Risk Manager, Carmel Loughman in New York.  (Doc. 98 at 7.)  Section 3

- 2 -

of the 2001 GAI applied to "any and all BONDS requested by CONTRACTOR, whether or not such BONDS were executed before or following the date of this Agreement." Section 5(a) of the 2001 GAI that Grupo México signed as Indemnitor provides:

> At SURETY'S sole discretion, SURETY may demand and upon SURETY'S demand, the UNDERSIGNED shall deliver over to SURETY collateral security acceptable to SURETY and equal in value to any reserve set up by SURETY to cover contingent losses and any subsequent increase thereof.

(Doc. 86 at 6; Doc 87, Ex. 9).  This collateral provision is similar, but not the same, as Section 7 of the 1993 GAI executed between Seaboard and ASARCO.  That section states in pertinent part:

> If the Surety shall set up a reserve to cover any contingent claim or claims, loss, costs, attorney's fees and/or other expenses in connection with any such Bond, the Undersigned, within ten (10) days after receipt of written demand, as evidenced by registry or certified mail return receipt, will pay to the Surety current funds in an amount equal to such reserve, and any subsequent increase thereof, such funds to be held by the Surety as collateral, in addition to the indemnity afforded by this instrument, with the right to use the same or any part thereof.

(Doc. 54, Ex. B.)  The next morning, Loughman sent the following e-mail to Grupo México (including Daniel Tellechea, and Hector Garcia de Quevedo and copying Kevin McCaffrey).  (Doc. 87, Ex. 9).  Loughman's February 16th email states in full:

> I received the executed General Agreement of Indemnity.  I have not given this document to St. Paul because I understand that you would prefer to sign a General Agreement of Indemnity/parental guarantee [sic] **only** with respect to the Mission Bonds.  You would then like to meet with the [sic] St. Paul in México to discuss the issue of broader indemnity.  With this understanding, the underwriter at St. Paul has agreed to issue the Mission bond today when he receives from you a letter that states:

> "Grupo México will indemnify St. Paul Surety on behalf of Asarco Incorporated for the three Mission reclamation bonds issued to the USA, Department of Interior, Bureau of Indian Affairs in the amounts of $7.0 million, $760,000, and $3.5 million, respectively."

> If you concur with this understanding, please fax this letter to me at 212.510.1910 as soon as possible so that these bonds can be sent by Federal Express to Doug McAllister, Tucson, today.

1    (*Id.*) (emphasis in the original).  In response to Loughman's e-mail,  Daniel Tellechea and

2    Hector Garcia de Quevedo addressed to Paul Salmon, underwriter for St. Paul Surety, the

3    following one-sentence letter ("The Indemnity Letter") which is an exact replica of the

4    middle paragraph from Loughman's February 16th e-mail:

5
6            Grupo México will indemnify St. Paul Surety on behalf of Asarco
             Incorporated for the three Mission reclamation bonds issued to the USA,
             Department of Interior, Bureau of Indian Affairs in the amounts of $7.0
7            million, $760,000, and $3.5 million, respectively.

8    (Doc. 1, Ex. A.) Grupo México faxed this letter directly to Ms. Loughman and she delivered

9    the letter to Paul Salmon. (Doc. 87 ¶ 19.) On February 16, 2001, upon receipt of this letter,

10   Seaboard issued to ASARCO three reclamation bonds totaling $11.26 million dollars with

11   ASARCO as principal, Seaboard as surety, and BIA as the obligee. (Doc 1, Ex. B.)[2]

12          On May 7, 2003, Seaboard terminated Bond #420669 in the amount of $760,000.

13   (Doc. 53, Ex. C.)   On August 7, 2003, BIA and Seaboard were sued by the San Xavier

14   Allottees, owners of the land covered by Bond #420669.  On January, 2005, the BIA

15   cancelled ASARCO's Tract I mining lease (No. 454-2-60) for failure to replace the Bond

16   #420669 that had been terminated by Seaboard in May 2003. (Doc. 53 at 3).  ASARCO

17   appealed the termination.  (Doc. 54, Ex. K.)

18

19
        [2]Seaboard contends that Grupo México's Indemnity Letter "obligated [Grupo México
20   to] ***all*** the terms of the General Agreement of Indemnity ***limited*** only on the three (3) Mission
     Mines."  (Doc. 86 at 5.)  Grupo México contends that the Indemnity Letter was never
21   "intended to be – a GAI limited to the Mission Mines." (Doc. 98 at 10.) Grupo México
     contends that it "never executed a parental guarantee [sic] or General Agreement of
22   Indemnity" but only executed the Indemnity Letter.  (Doc. 98 at 8, 10.)
23          Seaboard argues that, given the context of Ms. Loughman's email, the phrase "broader
24   indemnity" can only refer to the "other outstanding ASARCO bonds" and not the scope of
     obligations including the duty to post collateral.  (Doc. 107 at 5.)  Grupo México argues
25   "broader indemnity" refers not to the number of bonds, but can only refer to the broad
     provisions of the GAI including the collateral provision and because those were "too broad"
26   Grupo México never executed the GAI.  (Doc. 98 at 7, 8, 10.)
27
                                              - 4 -

1    On February 3, 2005, Seaboard notified ASARCO and Grupo México by letter

2    ("Collateral Demand Letter") that it had "established a reserve for anticipated losses and

3    expenses related to the [three] Reclamation Bonds" in the aggregate amount of $11,460,000,

4    and it was demanding collateral in this amount pursuant to Section 7 of the 1993 GAI

5    between ASARCO and Seaboard and the 2001 Indemnity Letter executed between Grupo

6    México and Seaboard.  (Doc. 54, Ex. F.)  Following this action, on March 30, 2005, the BIA

7    sent a clarification letter to Seaboard informing it that the "BIA has not concluded that

8    ASARCO has failed to meet its obligation requirements" and only if it has failed to do so

9    "will the BIA make demand on the bonds."  (Doc. 54, Ex. I.)  The San Xavier lawsuit was

10   dismissed April 2005.  (Doc. 54, Ex. H.)

11       In a letter dated June 1, 2005 Seaboard requested $131,689.84 in "incurred legal and

12   engineering fees related to the resolution" of the San Xavier lawsuit.  (Doc. 54, Ex. M.)

13   ASARCO responded June 21, 2005 and expressed a willingness "to discuss the possibility

14   of paying attorney's fees" incurred in the San Xavier Allottees lawsuit, but sought "actual

15   time records to assure itself of the reasonableness of the fees."  (Doc. 54, Ex. N).  Seaboard

16   now seeks to bring this claim against Grupo México for breach of contract[3] and seeks

17   specific performance or *quia timet* under the common law.  (Doc 1.)

18       **B. Procedural History**

19       Originally filed in the Superior Court of Arizona, Maricopa County, on July 28, 2005,

20   this action was removed to this Court on January 6, 2006 pursuant to 28 U.S.C. §§ 1332,

21   1441, and 1446.  (Doc. 1.)

22       Defendant first sought dismissal of this action on January 11, 2006 on the ground that

23   the Court lacked personal jurisdiction.  (Doc. 9.)  Plaintiff responded with a Motion for

24   Extension of Time to Respond to Defendant's Motion to Dismiss and Motion to Permit

25   _____

26       [3]As relief for Defendant's alleged breach of contract, Plaintiff seeks attorney's fees
     and the full face value of the three Mission Bonds to cover "contingent claims" on the bonds.

27

Jurisdictional Discovery.  (Doc. 12.)  The Court granted the extension and permitted jurisdictional discovery.  (Doc. 19).  During the course of discovery, Grupo México conceded personal jurisdiction and Plaintiff moved for the Court to permit discovery beyond the issue of personal jurisdiction.  (Doc. 46).  On December 14, 2006, the Court granted Plaintiff's motion and found that personal jurisdiction exists over Grupo México.  (Doc. 48).

Defendant now moves to dismiss for lack of subject matter jurisdiction.  (Docs. 53-54.)[4]  Plaintiff responded and filed a Cross-Motion for Summary Judgment.  (Docs. 86-87.)  Thereafter, Defendant filed a Response to Plaintiff's Cross-Motion for Summary Judgment.  (Doc. 97.)  Plaintiff then filed a Reply in Support of its Motion for Summary Judgment.  (Doc. 107.)[5]  Finally, Defendant filed a Reply to its Motion to Dismiss.  (Doc. 115.)  The motions are now fully briefed and ripe for decision.

## STANDARD OF REVIEW[6]

A motion to dismiss pursuant to Rule 12(b)(1) challenges a plaintiff's assertion that the court has subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "When subject matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), plaintiff has the burden of proving jurisdiction in order to survive the motion."  *Tosco Corp. v. Communities*

---

[4]The Court denied without prejudice Defendant's Motion to Dismiss for lack of Subject Matter Jurisdiction for procedural reasons.  (Doc. 89).  However, Defendant later filed a renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction.  (Doc. 95, Defs.' Mot. to Dismiss.)

[5]Due to "certain court filings and court orders entered in the United States Bankruptcy Court for the Southern District of Texas" Plaintiff now seeks leave to supplement its memorandum in support of its opposition to Defendants' pending Motion to Dismiss (Doc. 95)  and its memorandum in support of Plaintiff's Cross-Motion for Summary Judgment (Doc. 87) (Doc. 119 at 2.) For reasons set forth *infra*, the motion is **DENIED**.

[6]This case can be decided at the motion to dismiss stage because it is based on a 12(b)(1) challenge, which permits the court to look outside the pleadings in determining subject matter jurisdiction.  *McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988).

*for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001). "A plaintiff suing in a federal court must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction, and, if he does not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect can be corrected by amendment." *Id.* (citation omitted).

Rule 12(b)(1) jurisdictional attacks may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* When considering a "facial" attack, the factual allegations of the complaint are taken as true and construed in the light most favorable to the non-moving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). If the jurisdictional attack is "factual," the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988). Factual attacks on jurisdiction permit the Court to "look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In such cases, the allegations in the complaint need not be presumed true. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

"[T]he ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and may never occur, from those cases that are appropriate

for federal court action." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). As the Ninth Circuit previously stated, the court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). The ripeness inquiry contains both a constitutional and a prudential component. *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993).

The constitutional component of ripeness requires there be an Article III "case or controversy" where the issues are "definite and concrete, not hypothetical or abstract." *Thomas*, 220 F.3d at 1139 (citation omitted). The prudential component of ripeness is guided by two considerations: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 1141 (citation omitted).

## DISCUSSION

The scope of the "Indemnity Letter" agreement is the critical issue in this case.[7] If the Indemnity Letter is an agreement to be bound by the terms of the GAI, limited to the three Mission Bonds, then Seaboard may demand collateral to cover "any reserve" that Seaboard chooses to establish to cover contingent losses. In such a case, Seaboard's claim may be ripe for consideration. However, if the Indemnity Letter is merely an agreement to indemnify without referring to or incorporating any provisions of the GAI, including the posting of collateral upon demand, then Seaboard's claims are not be ripe. The question of ripeness thus turns on the meaning and nature of the February 16, 2001 Indemnity Letter agreement

---

[7] Both parties are in agreement that a contract exists. (Doc. 97 at 12, 14-15.) The question is the scope of the contract. (Doc. 107 at 2.)

In the Joint Proposed Case Management Plan, Defendant raises the question of whether the Indemnity Letter is an agreement or "merely evidence of an agreement to agree." (Doc. 57 at 5.) However, Defendant provides no argument or case law to support this one-time assertion and therefore the Court will not entertain this issue.

1  because without a resolution of this issue, the Court is unable to properly consider any issues

2  raised in reference to any obligations that may arise under the Indemnity Letter agreement.

3      **A.  Legal Principles**

4      Both parties rely on Arizona contract principles in their respective briefs, which the

5  Court will construe as a consent to be bound by Arizona's law of contracts.  (Doc. 57.)

6      The Supreme Court of Arizona has rejected the "restrictive view" of contract

7  interpretation that first requires a threshold finding of ambiguity before a judge may look

8  beyond the four corners of the instrument to determine meaning.  *Taylor v. State Farm Mut.*

9  *Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134, 1138 (1993).  In *Taylor*, the Court stated "that

10 what appears plain and clear to one judge may not be so plain to another . . . and the judge's

11 decision, uninformed by context, may not reflect the intent of the parties." *Taylor*, 175 Ariz.

12 at 152, 854 P.2d at 1138.  Instead, Arizona has adopted the "Corbin approach" and that of

13 the Restatement (Second) of Contracts expressing the view that "[t]o understand the

14 agreement, the judge cannot be restricted to the four corners of the document." *Id.* at 154,

15 854 P.2d at 1140; *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz.

16 383, 393, 682 P.2d 388, 398 (1984) ("In Arizona, therefore, the interpretation of a negotiated

17 agreement is not limited to the words set forth in the document.").

18     "The better rule," the *Taylor* court explains, "is that the judge first considers the

19 offered evidence and, if he or she finds that the contract language is "reasonably susceptible"

20 to the interpretation asserted by its proponent, the evidence is admissible to determine the

21 meaning intended by the parties." *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140.  "'The primary

22 and ultimate purpose of interpretation' is to discover that intent and to make it effective."

23 *Id.* at 152, 854 P.2d at 1138 (citing Corbin § 572B, at 421 (1992 Supp.)).  Fundamental to

24 that goal is ascertaining "the intention of the parties *at the time the contract was made* if at

25 all possible."  *Id.* at 153, 854 P.2d at 1139 (emphasis added) (citation omitted).  "The

26 meaning that appears plain and unambiguous on the first reading of a document may not

27

1    appear nearly so plain once the judge considers the evidence." *Id.* at 154, 854 P.2d at 1140.

2    For negotiated agreements, extrinsic evidence the court may consider includes "negotiation,

3    prior understandings, and subsequent conduct." *Id.* at 153, 854 P.2d at 1139 (citing *Darner*,

4    140 Ariz. at 393, 682 P.2d at 398).   As long as the evidence is "not being offered to

5    contradict or vary the meaning of the agreement" the evidence does not violate Arizona's

6    parol evidence rule and may be admitted. *Id.* at 154, 854 P.2d at 1140.  If the court finds "the

7    asserted meaning of the contract language is so unreasonable or extraordinary that it is

8    improbable that the parties actually subscribed to the interpretation asserted by the proponent

9    of the extrinsic evidence," the court may properly exclude this evidence. *Id.* at 153, 854 P.2d

10   at 1139.   Indeed, "the judge need not waste much time if the asserted interpretation is

11   unreasonable or the offered evidence is not persuasive." *Id.* at 155, 854 P.2d at 1141.

12           If the Court finds that the "language of the agreement, illuminated by the surrounding

13   circumstances, indicates that either of the interpretations offered [is] reasonable" then the

14   controversy over interpretation must be submitted to the jury. *Id.* at 159, 854 P.2d at 1145.

15           **B.  Plaintiff Interprets the Indemnity Letter to be the General Agreement of**

16   **Indemnity Limited to the Three Mission Bonds.**

17                          **1.  Interpretation Advanced in the Amended Complaint**

18           In its Amended Complaint, Plaintiff argues that the Indemnity Letter (therein referred

19   to as "the Grupo México Guaranty") is an agreement to "guarantee [sic] to St. Paul Surety

20   the indemnity obligations" of ASARCO.  (Doc. 1-3, ¶ 5.)  Plaintiff contends that "Grupo

21   México guaranteed ASARCO's performance of its indemnity obligations under the General

22   Agreement of Indemnity ("GAI") as they relate to the Reclamation Bonds."  (Doc. 1-3, ¶ 26,

23   48.)  The GAI referred to therein, cited in the Amended Complaint, is the 1993 GAI executed

24   between Seaboard and ASARCO.  (Doc. 1-3, ¶ 36-39, 41.)  According to Rule 10 of the

25   Federal Rules of Civil Procedure, "[a] copy of a written instrument that is an exhibit to a

26   pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).   Further

27

- 10 -

1  corroborating this interpretation of the agreement is Plaintiff's February 2005 "Collateral

2  Demand Letter" whereby Plaintiff notified ASARCO and Grupo México that it had

3  "established a reserve for anticipated losses and expenses related to the [three] Reclamation

4  Bonds" in the aggregate amount of $11,460,000.  Consequently, it was demanding collateral

5  in this amount *pursuant to Section 7 of the 1993 GAI and the 2001 Indemnity Letter.*  (Doc.

6  54, Ex. F.)  Both the 1993 GAI and the 2001 Indemnity Letter were attached as exhibits to

7  the Amended Complaint. (Doc. 1-3.)

8              **2.  Interpretation Advanced in Plaintiff's Cross Motion for Summary**

9              **Judgment**

10         In its Cross Motion for Summary Judgment, Plaintiff produced for the first time the

11  2001 GAI that was signed by Grupo México and delivered to ASARCO but which was not

12  delivered to Seaboard.  (Doc. 87, Ex. 9.)  In its motion, Plaintiff argues that the Indemnity

13  Letter is "an agreement by Grupo México to be bound by the terms of the [2001] General

14  Agreement of Indemnity limited to the three mines owned and operated by" ASARCO (Doc.

15  86 at 1); that it is "in fact a parental guarantee [sic] of *all* ASARCO's obligations under the

16  reclamation bonds limited to the three (3) Mission Mines" (Doc. 86 at 2); that Ms. Loughman

17  understood it to be an agreement by Grupo México to be "obligated to ***all*** the terms of the

18  [2001] General Agreement of Indemnity ***limited*** only on the three (3) Mission Mines" (Doc.

19  86 at 5); that it is an agreement "to the terms of the [2001] long form GAI limited to the

20  bonds on the Mission Mines."  (Doc. 86 at 8.)  While completely absent from its Amended

21  Complaint, Plaintiff now refers to Section 5(a), the collateral provision of the 2001 GAI,

22  rather than Section 7 of the 1993 GAI.  (Doc. 86 at 6.)  Neither this section, nor the document

23  in its entirety, formed the original basis for Plaintiff's Collateral Demand Letter.  (Doc. 54,

24  Ex. F.)  In its Cross Motion for Summary Judgment, Plaintiff's new interpretation is that the

25

26

27

1   Indemnity Letter binds Grupo México to all of the terms of the 2001 General Agreement of

2   Indemnity limited to the three Mission bonds.[8]

3   **C. Consequences of Seaboard's Differing Interpretations**

4   The Court cannot ignore the significance of these two distinct interpretations proffered

5   by Plaintiff.  While the Court recognizes that Plaintiff is not asserting a brand new claim in

6   addition to that for breach of contract in its Motion for Summary Judgment, the Court finds

7   that Plaintiff's new interpretation amounts to a new theory of the case.

8   The Ninth Circuit has held that "when issues are raised in opposition to a motion to

9   summary judgment that are outside the scope of the complaint" the district court should treat

10  this as a request to amend the pleadings under rule 15(b) of the Federal Rules of Civil

11  Procedure.  *Apache Survival Coalition v. U.S.,* 21 F.3d 895, 910 (9th Cir. 1994) (citations

12  omitted); *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) ("An addition of new issues during

13  the pendency of a summary judgment motion can be treated as a motion for leave to amend

14  the complaint.").  Following the liberal amendment policy of Rule 15, amendments should

15  be "freely given" in absence of "undue delay, bad faith or dilatory motive on the part of the

16  movant, repeated failure to cure deficiencies by amendments previously allowed, undue

17  prejudice to the opposing party by virtue of allowance of the amendment, futility of

18  amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); Fed. R. Civ.

19  P. 15(a).

20  Although this case is distinguishable from *Apache* and *Kaplan* in that the Plaintiff is

21  not raising issues outside the pleadings in *response* to a motion for summary judgment by the

22  Defendant, the case does reinforce the liberal policy behind Rule 15.  Instead of raising a

23  ───────────────

24  [8] In its Reply, Plaintiff downplays its former characterization and argues that the
    Indemnity Letter is an agreement by Grupo México "to be bound to Seaboard Surety to the

25  same extent" as ASARCO (Doc. 107 at 1); that it is a "parental guarantee [sic] of all

26  ASARCO's obligations owed to Seaboard Surety as a result of its issuance of the reclamation
    bonds for the Mission Mines."  (Doc. 107 at 16.)

27

new theory in a responsive brief, Plaintiff is raising, for the first time, a new interpretation of the Indemnity Letter within its own Motion for Summary Judgment. Based on the liberal interpretation of Rule 15 and the fact that it is a new theory not claim being raised by Plaintiff, the Court will treat Plaintiff's Motion for Summary Judgment as a request for leave to amend its Complaint for the purpose of including its new theory proffered in its Motion for Summary Judgment. The Ninth Circuit explains that "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). In *Coleman*, the Ninth Circuit agreed with the reasoning of the Third Circuit in *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993) "that adding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under this second theory of liability." *Coleman*, 232 F.3d at 1292. Absent amendment to the Complaint, there is a significant risk of prejudice to the Defendant.[9]

In this case, the parties began discovery beyond personal jurisdiction on December 14, 2006. The nine month fact discovery period was completed on September 14, 2007. The great majority of depositions were taken in May 2007. Plaintiff submitted its Cross Motion for Summary Judgment, including its new interpretation of the Indemnity Letter on June 29, 2007, leaving Defendant with approximately eleven (11) weeks to conduct discovery in response to the newly proffered interpretation. Because the Defendant is faced with "different burdens and defenses" under the Plaintiff's second interpretation, the Court finds that permitting Plaintiff to go forward with a new theory without permitting Plaintiff to amend its Complaint could result in "undue prejudice" to the Defendant. *Coleman*, 232 F.3d at 1292; *Foman*, 371 U.S. at 182.

---

[9] Defendant conducted discovery strictly based on the Plaintiff's Amended Complaint.

1    **2.    Allowing Plaintiff to Proceed with Two Different Contract**
2    **Interpretations Frustrates the Court's Parol Evidence Analysis**

3    The standard for contract interpretation under Arizona contract law is to examine
4    whether the interpretation*, not interpretations,* proffered by the proponent is "reasonably
5    susceptible" to the language of the agreement.  *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140.
6    The Court recognizes that Plaintiff may plead claims for relief in the alternative, regardless
7    of consistency.  Fed. R. Civ. P. 8(d).  However, what Plaintiff has proffered are two distinct
8    interpretations of what the Indemnity Letter means, not two alternative claims for relief.
9    Here, where "[t]he primary and ultimate purpose of interpretation" is to discover "the
10   intention of the parties at the time the contract was made if at all possible" and "make [such
11   intent] effective," Seaboard's two distinct interpretations, with one introduced at the pleading
12   stage, and a different one introduced at the summary judgment stage, with no accompanying
13   explanation, frustrates the Court's ability to determine the admission of parol evidence.
14   *Taylor*, 175 Ariz. at 152, 153, 854 P.2d at 1138, 1139.  For these reasons, the Court finds no
15   reason to continue the parol evidence admission analysis at this time.

16   **D.  Implications for Subject Matter Jurisdiction**

17   The Ninth Circuit has held that "[a] plaintiff suing in a federal court must show in his
18   pleading, affirmatively and distinctly, the existence of whatever is essential to federal
19   jurisdiction, and, if he does not do so, the court, on having the defect called to its attention
20   or on discovering the same, **must dismiss the case, unless the defect can be corrected by**
21   **amendment**."  *Tosco Corp.*, 236 F.3d at 499.  (Emphasis added).  In order to establish that
22   a claim is ripe, Plaintiff has the burden of establishing that the Indemnity Letter is, in fact,
23   the 2001 GAI limited to the three Mission Bonds.  (Doc. 86.)  Because the Plaintiff proffers
24   two distinct and thereby conflicting interpretations, the Court is unable to determine this
25   matter until an Amended Complaint is filed and Defendant has had the opportunity to
26   conduct discovery based on the specific theories set forth within the Amended Complaint

27

- 14 -

prior to responding thereto. Moreover, it is significant to point out that Plaintiff's differing theories rely on distinct interpretations of underlying facts and the credibility of witnesses advocating those interpretations. Questions of conflicting facts and credibility are reserved for determination by the fact-finder.

## CONCLUSION

Accordingly,

**IT IS FURTHER ORDERED DENYING** Plaintiff's Motion for Summary Judgment (Doc. 86.)

**IT IS HEREBY ORDERED DENYING WITHOUT PREJUDICE** Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction.[10] (Doc. 95.)

**IT IS FURTHER ORDERED DENYING** Seaboard's Motion to Supplement and Request for Judicial Notice (Doc. 119.)

DATED this 29th day of September, 2008.

_____
Stephen M. McNamee
United States District Judge

---

[10] The filing of an amended complaint replaces the previous complaint. Accordingly, the Court finds it necessary to deny the motion to dismiss with leave to refile based on the Amended Complaint. *Armstrong v. Davis,* 275 F.3d 849 (9th 2001); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1546 (9th Cir. 1989); *Bullen v. De Bretteville,* 239 F.2d 824, 833 (9th Cir. 1956).